# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2013 DEC 11  PM 1:30

Form To Be Used By A Prisoner in Filing a Complaint
Under the Civil Rights Act, 42 U.S.C. § 1983

DEPUTY CLERK_____

ANSON CHI, #312275
Plaintiff's name and ID number

COLLIN COUNTY DETENTION FACILITY
Place of Confinement

Case No. **3 - 13CV - 4836 B**
(Clerk will assign the number)

v.

JOHN DOE #1, 909 14th Street, Plano, Texas, 75074
Defendant's name and address

JOHN DOE #2, 909 14th Street, Plano, Texas, 75074
Defendant's name and address

(see pages 6 and 7 for the complete list of all
Defendant                    defendants)
( DO NOT USE "ET AL.")

JURY TRIAL DEMANDED

---

### INSTRUCTIONS - READ CAREFULLY

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form.**

1.  To start an action you must file an original and one copy of your complaint with the court.  You should keep copy of the complaint for your own records.

2.  Your complaint must be legibly handwritten, in ink, or typewritten.  You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct. If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACK SIDE OF ANY PAGE.** ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.  You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure. Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.  When these forms are completed, mail the original and one copy to the Clerk of the United States Court for the appropriate District of Texas in the Division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred. The list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate District Court, the Division and an address list of the Divisional Clerks.

**FILING FEE AND IN FORMA PAUPERIS**

1.  In order for your complaint to be filed, it must be accompanied by the filing fee of $350.00.

2. If you do not have the necessary funds to pay the filing fee in full at this time, you may request permission to proceed *in forma pauperis*.  In this event you must complete the application to proceed *in forma pauperis (IFP)*, setting forth information to establish your inability to prepay the fees and costs or give security therefor.  You must also include a current six (6) month history of your Inmate Trust Account.  You can acquire the application to proceed IFP and appropriate Inmate Account Certificate from the law library at your prison unit.

3.  28 U.S.C. 1915, as amended by the Prison Litigation Reform Act of 1995 (PLRA), provides, "...if a prisoner brings a civil action or files an appeal *in forma pauperis,* the prisoner shall be required to pay the full amount of a filing fee."  Thus, the Court is required to assess and, when funds exist, collect, the entire filing fee or an initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis* , the Court will apply 28 U.S.C. 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from your Inmate Account, until the entire $350 filing fee has been paid.

4.  If you intend to seek *in forma pauperis* status, then do not send your complaint without an Application to Proceed IFP, and the Certificate of Inmate Trust Account.  Complete all the essential paperwork before submitting it to the Court.

**CHANGE OF ADDRESS**

It is your responsibility to inform the Court of any change of address and its effective date.  Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion (s) for any other relief.  Failure to file a **NOTICE TO THE COURT OF CHANGE OF ADDRESS** may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I.   PREVIOUS LAWSUITS:

A. Have you filed *any* other lawsuits in state or federal court relating to your imprisonment?  ___YES  √NO

B. If your answer to "A" is "yes," describe each lawsuit in the space  below.  (If there is more than one lawsuit, describe the additional  lawsuits on another piece of paper, giving the same information.)

1.  Approximate date of filing lawsuit:_____

2.  Parties to previous lawsuit:
Plaintiff(s)_____
Defendant(s)_____

3.  Court: (If federal, name the district; if state, name the county.) _____

4.  Docket Number:_____

5.  Name of judge to whom case was assigned:_____

6.  Disposition:  (Was the case dismissed, appealed, still pending?)
_____

7.  Approximate date of disposition:_____

II.   PLACE OF PRESENT CONFINEMENT: COLLIN COUNTY DETENTION FACILITY

III.  EXHAUSTION OF GRIEVANCE PROCEDURES:
      Have you exhausted both steps of the grievance procedure in this institution?   ✓ YES  ___ NO

      Attach a copy of the Step 2 grievance with the response supplied by the prison system. (see page 8)

IV.   PARTIES TO THIS SUIT:
      A. Name and address of plaintiff: ANSON CHI

      COLLIN COUNTY DETENTION FACILITY, 4300 Community Ave., McKinney, Texas, 75071

      B. Full name of each defendant, his official position, his place of employment, and his full mailing address.

      Defendant #1: JOHN DOE #1, police officer of the City of Plano Police Department, 909 14th Street, Plano, Texas, 75074

      Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you. Defendant physically attacked, literally tortured, and attempted to murder Plaintiff by method of lethal chemical injections through IVs supplied by the Parkland Hospital nursing staff in an attempt to obtain a forced confession then kill Plaintiff, alleged a terrorist.

      Defendant #2: JOHN DOE #2, police officer of the City of Plano Police Department, 909 14th Street, Plano, Texas, 75074

      Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
      Defendant physically attacked, literally tortured, and attempted to murder Plaintiff... (Id. as Defendant #1)

      Defendant #3: JOHN DOE #3, police officer of the City of Plano Police Department, 909 14th Street, Plano, Texas, 75074

      Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
      Defendant physically attacked, literally tortured, and attempted to murder Plaintiff... (Id. as Defendant #1)

      Defendant #4: MIKE MOORE, nurse, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX, 75235

      Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
      Defendant conspired with JOHN DOE #1, #2, and #3 in attacking, torturing, and attempting to murder Plaintiff by providing and setting up the necessary medical equipment for the lethal chemical injections.

      Defendant #5: (see pages 9 to 14 for Defendant #5 through Defendant #24)

      Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

3

V.    STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved.  Describe how each defendant is involved.  You need not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra pages if necessary, but remember that the complaint must be stated briefly and concisely. IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

1. From June 18 to June 19, 2012, at Parkland Hospital, Defendant #1, #2, and #3 physically attacked, literally tortured, and attempted to murder the plaintiff by injecting him with lethal chemicals through IVs supplied and administered by the hospital staff in an attempt to obtain a forced confession then kill the plaintiff, who was alleged a terrorist. The hospital staff includes Defendant #4 to #7 who conspired with Defendant #1, #2, and #3 in attacking, torturing, and attempting to murder the plaintiff while Defendant #8, #9, and #10 observed the misconduct, did absolutely nothing to stop it, but instead, cheered them all on.

2. Defendant #20 knew about the torture/attempted murder, did not investigate or fix it as promised, and conspired with other law enforcement officers in an attempt to suppress the misconduct.

3. Defendant #21 acted under color of state law by colluding with Defendant #1, #2, and #3 in the torture of the plaintiff for a forced confession then suppressing the misconduct by intentionally not investigating it, and conspiring with Defendant #11 through #17 at two separate hospitals in doctoring the plaintiff's medical ...

(continued on pages 15 to 16)

VI.   RELIEF:  State briefly exactly what you want the court to do for you.   Make no legal arguments. Cite no cases or statutes.

Plaintiff seeks compensatory and punitive damages — plus any potential attorney's fees — from each defendant except for Defendant #24; Plaintiff seeks compensatory damages and any potential attorney's fees from Defendant #24.

VII.  GENERAL BACKGROUND INFORMATION:

A. State, in complete form, all names you have ever used or been known by including any and all aliases:

ANSON CHI, ANSON VERVE CHI

B. List all TDCJ-ID identification numbers you have ever been assigned  and all other state or federal prison or FBI numbers ever assigned to you, if known to you.

FBI #984596WC9, USM #44588-177, CCSO #312275

VIII. SANCTIONS:

A. Have you been sanctioned by any court as a result of  any lawsuit you have filed?   ____YES  ✓ NO

B. If your answer is "yes", give the following  information for every lawsuit in which sanctions were imposed. (If more than one, use another piece of paper and answer the same questions.)

    1.  Court that imposed sanctions (if federal, give the district and division):

    2.  Case Number:_____

    3.  Approximate date sanctions were imposed:_____

    4.  Have the sanctions been lifted or otherwise satisfied?
        ____YES____NO

C. Has any court ever warned or notified you that sanctions could be imposed?      _____ YES __✓__ NO

D. If your answer is "yes", give the following information for every lawsuit in which warning was imposed. (If more than one, use another piece of paper and answer the same questions.)

1. Court that imposed warning (if federal, give the district and division): _____

2. Case Number: _____

3. Approximate date warnings were imposed: _____

Executed on: __11/29/13__
                DATE

_____ANSON CHI_____

_____
(Signature of plaintiff)

## PLAINTIFF'S DECLARATIONS

1. I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.

2. I understand if I am released or transferred, it is my responsibility to keep the Court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.

3. I understand that I must exhaust all available administrative remedies prior to filing this lawsuit.

4. I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions in a Court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.

5. I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire $350 filing fee and costs assessed by the Court, which shall be deducted in accordance with the law from my inmate account by my custodian until the filing fee is paid.

Signed this ___29th___ day of __November__ , __2013__ .
              (Day)                    (month)          (year)

_____ANSON CHI_____

_____
(Signature of plaintiff)

**WARNING: The Plaintiff is hereby advised any false or deliberately misleading information provided in response to the following questions will result in the imposition of sanctions. The sanctions the Court may impose include, but are not limited to monetary sanctions and/or the dismissal of this action with prejudice.**

## COMPLETE LIST OF ALL DEFENDANTS

NOTE: Every defendant is personally involved as required under 42 U.S.C. §1983. All JOHN DOE and JANE DOE defendants will be identified through civil discovery. (See Roper v. Grayson, 81 F.3d 124,126 (10th Cir. 1996))

1. JOHN DOE #1, 909 14th Street, Plano, Texas, 75074
2. JOHN DOE #2, 909 14th Street, Plano, Texas, 75074
3. JOHN DOE #3, 909 14th Street, Plano, Texas, 75074
4. MIKE MOORE, 5201 Harry Hines Boulevard, Dallas, Texas, 75235
5. JANE DOE #1, 5201 Harry Hines Blvd., Dallas, TX, 75235
6. JANE DOE #2, 5201 Harry Hines Blvd., Dallas, TX, 75235
7. JOHN DOE #4, 5201 Harry Hines Blvd., Dallas, TX, 75235
8. JANE DOE #3, 5201 Harry Hines Blvd., Dallas, TX, 75235
9. JANE DOE #4, 5201 Harry Hines Blvd., Dallas, TX, 75235
10. JANE DOE #5, 5201 Harry Hines Blvd., Dallas, TX, 75235
11. MATTHEW MOORE CARRICK, M.D., 3901 West 15th Street, Plano, Texas, 75075
12. MARK OLIVER TUCKER, M.D., 3901 West 15th Street, Plano, Texas, 75075
13. HALLI B. CARR, M.D., 3901 W. 15th Street, Plano, TX, 75075
14. IULIAN M. BURTEA, M.D., 3901 West 15th Street, Plano, Texas, 75075
15. ALICIA L. STARR, M.D., 3901 West 15th Street, Plano, Texas, 75075
16. GELENA A. MCWETHY, 3901 West 15th Street, Plano, Texas, 75075

6

17. KATHERINE RICHENBERGER, 3901 West 15th Street, Plano, Texas, 75075
18. THE MEDICAL CENTER OF PLANO, 3901 West 15th Street, Plano, TX, 75075
19. PARKLAND MEMORIAL HOSPITAL, 5201 Harry Hines Blvd., Dallas, TX, 75235
20. ALLEN G. GOEHRING, One Justice Way, Dallas, Texas, 75220
21. JAMES DANIEL WOFFORD, One Justice Way, Dallas, Texas, 75220
22. ROBERT JOHNSON, Ph.D., 3150 Horton Road, Fort Worth, Texas, 76119
23. ANDREW MILTON STOVER, 101 E. Park Blvd. Suite 500, Plano, Texas, 75074
24. CITY OF PLANO POLICE DEPARTMENT, 909 14th Street, Plano, Texas, 75074

Defendants #1 through #19 are sued in their individual and official capacities.

Defendants #20 through #23 are sued in their individual capacity.

Defendant #24 is sued in both individual and official capacities.

## Step 2 Grievance Exemption

Plaintiff, ANSON CHI, is exempt from 42 U.S.C. §1997(e)(a), the Prison Litigation Reform Act Exhaustion Requirement, because Plaintiff's action is not "brought with respect to prison conditions," but brought with respect to law enforcement misconduct outside of the prison system.

Moreover, this action states events that occurred when Plaintiff was a suspect/person of interest in a criminal case and not yet an arrestee, pre-trial detainee, inmate, or prisoner.

Furthermore, Plaintiff exercised due diligence and sought to exhaust grievance procedures (administrative remedies) anyway with the Professional Standards Unit (Internal Affairs Division) of the City of Plano Police Department but is still awaiting the notification of disposition. (See Exhibit 4) Plaintiff does not wish to wait any longer or face a time-bar on this federal civil rights claim.

Pursuant to 28 U.S.C. §1746, I, ANSON CHI, the plaintiff in this case, declare under penalty of perjury that the foregoing is true and correct.

Signed this 29th day of November, 2013.

ANSON CHI
Plaintiff

8

# IV. PARTIES TO THIS SUIT - PART B (CONTINUED)

Defendant #5: JANE DOE #1, nurse, Parkland Memorial Hospital, 5201 Harry Hines Blvd, Dallas, TX, 75235
  Defendant (first name Annie or Anna) knew about the torture/attempted murder, observed all of it in its entirety, but did not try to stop or fix it. She was assigned as the on-duty nurse for Plaintiff from June 18-19, 2012.

Defendant #6: JANE DOE #2, nurses' aide, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX, 75235
  Defendant (obese, short African-American) conspired with Defendants #1 through #4 in attacking, torturing, and attempting to murder Plaintiff by suffocating him with a toxic chemical resembling chloroform and assisting police officers and MIKE MOORE with their misconduct.

Defendant #7: JOHN DOE #4, nurses' aide, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX, 75235
  Defendant (first name Sergio) aided and abetted MIKE MOORE with the medical equipment — IVs, tubes, locks, chemicals, etc. — used to torture Plaintiff.

Defendant #8: JANE DOE #3, receptionist, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX, 75235
  Defendant knew about the torture/attempted murder, observed all of it in its entirety, did not try to stop it, but instead, cheered Defendants #1 through #7 on, and even encouraged the police officers by telling them to "Hurry up!" so that Plaintiff would stop yelling and die already.

Defendant #9: JANE DOE #4, receptionist, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX, 75235
Defendant knew about the torture/attempted murder, observed all of it in its entirety, but did not try to stop or fix it.

Defendant #10: JANE DOE #5, receptionist, Parkland Memorial Hospital, 5201 Harry Hines Blvd., Dallas, TX 75235
Id. as Defendant #9.

Defendant #11: MATTHEW MOORE CARRICK, M.D., medical doctor, The Medical Center of Plano, 3901 West 15th Street, Plano, Texas, 75075
Defendant conspired with law enforcement officers to doctor Plaintiff's medical records and falsify medical reports in an attempt to cover-up police misconduct/ torture. (For example, pictures of Plaintiff's injuries from the torture at Parkland Hospital appear in the Medical Center of Plano medical files to make it look like they were a result of the accident Plaintiff was in but Carrick made a costly mistake because those injuries could only have resulted from severe IV chemical injections that originated inside the veins and erupted out, as confirmed by the nurses and doctors who treated Plaintiff while in jail.

Defendant #12: MARK OLIVER TUCKER, M.D., medical doctor, The Medical Center of Plano, 3901 West 15th Street, Plano, Texas, 75075
Defendant conspired with law enforcement officers to doctor Plaintiff's medical records and falsify medical

reports in an attempt to cover-up police misconduct/torture. Defendant made false statements about the Plaintiff's torture injuries being from the accident when the injuries could only have resulted from severe IV chemical injections that originated inside the veins and ruptured into extreme third-degree **burns** of the skin.

Defendant #13: HALLI B. CARR, M.D., medical doctor, The Medical Center of Plano, 3901 West 15th Street, Plano, TX, 75075

**Id.** as Defendant #12.

Defendant #14: IULIAN M. BURTEA, M.D., medical doctor, The Medical Center of Plano, 3901 West 15th Street, Plano, Texas, 75075

**Id.** as Defendant #12.

Defendant #15: ALICIA L. STARR, M.D., medical doctor, The Medical Center of Plano, 3901 West 15th Street, Plano, Texas, 75075

**Id.** as Defendant #12.

Defendant #16: GELENA A. MCWETHY, technologist, The Medical Center of Plano, 3901 W. 15th Street, Plano, Texas, 75075

Defendant conspired in doctoring the plaintiff's medical records.

Defendant #17: KATHERINE RICHENBERGER,

**11**

technologist, The Medical Center of Plano, 3901 W. 15th Street, Plano, Texas, 75075
Id. as Defendant #16.

### Defendant #18: THE MEDICAL CENTER OF PLANO, corporation, pro se, 3901 W. 15th Street, Plano, TX, 75075

Defendant conspired with law enforcement in doctoring the plaintiff's medical records and falsifying reports; failed to provide security which allowed its employees to alter and falsify the plaintiff's medical records; and failed to act when notified of misconduct by the plaintiff.

### Defendant #19: PARKLAND MEMORIAL HOSPITAL, corporation, pro se, 5201 Harry Hines Blvd, Dallas, TX, 75235

Defendant conspired with law enforcement in doctoring the plaintiff's medical records and falsifying reports; failed to provide security that would have stopped the 2-day torture; failed to train employees on how to treat patients accused of crime; and failed to act when notified of misconduct by the plaintiff.

### Defendant #20: ALLEN G. GOEHRING, task force officer, Federal Bureau of Investigation, One Justice Way, Dallas, Texas, 75220

Defendant knew about the torture/attempted murder, did not investigate or fix it as promised to the plaintiff, and conspired with other law enforcement officers in an attempt to suppress the misconduct.

Defendant #21: JAMES DANIEL WOFFORD, task force officer, Federal Bureau of Investigation, One Justice Way, Dallas, Texas, 75220
    Defendant colluded with police officers in the torture of the plaintiff for a forced confession, and conspired with local police officers and the medical staff at two separate hospitals in doctoring the plaintiff's medical records and falsifying reports in an attempt to cover-up the torture.

Defendant #22: ROBERT JOHNSON, Ph.D., psychologist, Federal Correctional Institution, 3150 Horton Road, Fort Worth, Texas, 76119
    Defendant conspired by making false statements in his report about the plaintiff in order to help suppress the torture/attempted murder.

Defendant #23: ANDREW MILTON STOVER, assistant United States attorney, UNITED STATES OF AMERICA, 101 E. Park Blvd. Suite 500, Plano, TX, 75074
    Defendant conspired and acted outside the scope of his official prosecutorial duties by fabricating false evidence with the plaintiff's doctored medical records and falsified reports in an attempt to cover-up misconduct in the investigation, thus, acted under color of state law and relinquishes absolute immunity.

Defendant #24: CITY OF PLANO POLICE DEPARTMENT, municipality, pro se, 909 14th Street, Plano, TX, 75074

Defendant's absence of a policy to ensure the safety and protection of suspects under custody in private areas where officers are free to commit assaults thinking they will not be held accountable; failure to adequately train police officers about situations involving high-profile suspects under custody in private areas; unwritten policy to intentionally stall and delay investigations relating to civilian complaints against police where the disposition would clearly favor the complainant.

14

# V. STATEMENT OF CLAIM (CONTINUED)

...records and falsifying reports in an attempt to cover-up the torture.

4. Defendant #22 conspired by lying in his psychological report in order to help suppress the misconduct.

5. Defendant #23 conspired and acted outside the scope of his official prosecutorial duties by fabricating false evidence with the plaintiff's doctored medical records and falsified reports in an attempt to cover-up misconduct in the investigation, thus, acted under color of state law and relinquishes absolute immunity.

6. Defendant #19 conspired with law enforcement in doctoring the plaintiff's medical records and falsifying reports; failed to provide security that would have stopped the 2-day torture; failed to train employees on how to treat patients accused of crimes; and failed to act when notified of misconduct by the plaintiff.

7. Defendant #18 conspired with law enforcement in doctoring the plaintiff's medical records and falsifying reports; failed to provide security which allowed its employees to alter and falsify the plaintiff's medical records; and failed to act when notified of misconduct by the plaintiff.

8. Defendant #24 lacked a policy to protect the plaintiff and failed to adequately train police officers, as well as intentionally delaying the investigation into misconduct.

15

9. As a result of the attack, torture, and attempted murder, the plaintiff has severe mental, emotional, and physical injuries that are forever permanent, extremely painful, and grotesquely disfiguring.

10. The plaintiff has stated violations of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, as well as under the following international laws and treaties: (1) Restatement (Third) of Foreign Relations Law, Section 702 (1987); (2) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; (3) International Covenant on Civil and Political Rights; (4) Universal Declaration of Human Rights; (5) American Declaration on the Rights and Duties of Man.

OPTIONAL: To show that this claim is not factually frivolous, attached is Exhibit 1, the sworn deposition of the version of events.

16

# EXHIBIT 1

In the UNITED STATES DISTRICT COURT
For the NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| ANSON CHI | : | |
| Plaintiff, | : | AFFIDAVIT |
| v. | : | |
| | : | Civil Action No. _____ |
| JOHN DOE #1, et al. | : | |
| Defendants. | : | JURY TRIAL DEMANDED |
| | : | |

## AFFIDAVIT OF ANSON CHI IN SUPPORT OF CIVIL ACTION

I, ANSON CHI, being duly sworn according to the law depose and say that I am the plaintiff in the above-entitled case. ANSON CHI states:

1. I make this affidavit in support of my federal civil rights claim.

2. On June 18, 2012, I was injured in an accident and transported by paramedics over to the Medical Center of Plano, then to Parkland Memorial Hospital in Dallas, Texas.

3. After surgery in the operating room, I was questioned by nurses about what happened. I exercised my right to remain silent. One nurse stated the comment, "He made a bomb. That's why the police are outside the door."

4. After I was listed in stable condition, I was transferred to Recovery Room 231 some time in the evening with the sun still out. Police Officer #1 was waiting for me inside the room. He interrogated me by asking me a myriad questions over and over again without reading my rights, questions such as "Why'd you do it?" and "What terrorist group are you with?" I exercised my right to remain silent, as I had previously done during law enforcement encounters. Proof of this is on Page 10 of my presentence investigation report, which shows my "Failure to Identify: Refuses to Give Info" to police on April 12, 2012, proving I do **not** speak to law enforcement for any reason. A copy of Page 10 of the presentence investigation report is attached as Exhibit 2. Police Officer #1 finally stopped interrogating me and as he left the room, said, "I'll show you what we do to terrorists..."

5. Ten minutes passed, then a male nurse and a female nurse approached me as I lay in bed, unable to move because of my injuries, multiple surgeries, and my ankles cuffed

together tightly. When the male nurse bent over to get a closer look at me, I read his name tag: "Mike Moore." Mike Moore looked at the female nurse and said, "This guy's history, right?" The female nurse raised both her hands immediately and said, "You guys do it. I don't want anything to do with this!" I stared her down hard with icy eyes and said, "You're going to hell for this!" A rash of panic broke out over her face as she jumped into the arms of Mike Moore and shrieked," He said I'm going to hell!" Mike Moore comforted her by saying, "Don't worry, Annie. The only person going to hell is this terrorist."

6. Mike Moore walked over to a machine, pulled out two IV lines to the top of my shins, and inserted both into the locks on each of my ankles. Mike Moore whispered to Annie. They both moved toward the white curtain that separated the room and closed it behind them, then left.

7. A few minutes later, I felt a blinding stab of pain shoot straight from my feet all the way up my body. I screamed at the top of my lungs as a result. I felt it again moments later, then again, like lightning coursing through every nerve inside me. The intervals were close to ten seconds apart,

3

I knew I was being injected with lethal chemicals due to the regular intervals, and I knew they were attempting to kill me due to the increased intensity of pain.

8. After numerous injections followed by constant screaming, an obese African-American nurses' aide finally entered the room and asked why I was screaming. I explained to her that I was being tortured with lethal chemical injections sent through the IVs. She ignored my plea for help and left the room without bothering to check the IVs.

9. As the lethal injections continued, I heard giggling behind the white curtain. I recognized it as Police Officer #1. He was whispering to two other men whom I identified as Police Officer #2 and Police Officer #3. I also identified them as the culprits responsible for the torture because every injection started with a hissing sound that originated from behind the curtain. I discovered that the police officers were using a remote device that injected lethal chemicals into me through the IVs.

10. Due to the increasing frequency of the chemical injections,

4

I was already experiencing migraines, severe heart palpitations, and extreme difficulty breathing. I did not want to die so I reached down as far as I could in an attempt to pull out the IVs but the surgery to my abdomen prevented me from doing so. I tried repeatedly but to no avail.

11. I kept screaming and yelling for help and when I finally heard somebody come to the door, Police Officer #3 blocked off entry completely. He spoke to the good samaritan through a small crack in the door, then shut it quickly. I felt the hope inside me die like a firefly in the night and thought I was going to die because no one could help me.

12. I literally begged, cried, and pleaded with the officers to stop torturing me but they continued to inject me with lethal chemicals throughout the day and night— maliciously and sadistically with evil motive and intent to kill. After several hours, the shivering in my upper body avalanched down to my legs, forcing me into uncontrollable spasms.

13. With only one option left, I catapulted myself forward in an attempt to grab the IV lines with both hands one

more time. My indomitable will overcame the excruciating pain in my abdomen and somehow I managed to clutch both IV lines, then fell back to let gravity pull them out. Blood immediately soaked the bandages covering my abdomen.

14. Just when I thought it was over, Police Officer #2 peeped through the white curtain to see why I was so quiet. He saw that the IV lines were ripped out. He retreated his head back behind the curtain and whispered to his cohorts. I could see that it was dark now outside the window.

15. I passed out for some time during their break but was suddenly woken up by Police Officer #1 and Police Officer #2 pinning my arms down while Mike Moore embedded IVs into my left wrist, the vein between my right thumb and forefinger, and the tip of my right forefinger. I was too weak from the torture and too hurt from my injuries to fight back. Police Officer #2 continued to physically attack me by pressing down hard on my injuries to cause me fierce pain. When they finished working on me like a race car, they resumed their places and resumed the torture. This time, I could not pull out the IVs because they were embedded deep beneath my skin.

6

16. Countless hours passed as I started to experience intense seizures and intermittent blackouts, my heart pounding furiously and almost ripping out of my chest, my ears ringing decibels beyond deafening.

17. To facilitate the torture, the obese African-American nurses' aide confronted me with a glass bottle fuming with white cloudy vapor that resembled chloroform. She held the bottle to my face and waved the vaporous mist under my nose with her gloved hand. My eyelids fluttered spastically, nose burning, dizziness drowning me quickly. My head twitched violently and my body shook in convulsions as I fell in and out of consciousness. I could see the white light at the end of the tunnel over and over again when I almost died several times throughout the torture.

18. I had never experienced pain so unbearable, not even from the accident that put me in the hospital in the first place. I tried faking I was dead by holding my breath in order to stop the torture. I heard Police Officers #1, #2, and #3, as well as Mike Moore, Nurse Annie, the African-American nurses' aide, and a male nurses' aide (whom I later identified as "Sergio"), patting each other on the back, congratulating each other, saying

7

things like, "He's finally dead," and "Bye, bye, terrorist." But when I gasped for air, they sighed and continued injecting me with lethal chemicals.

19. The police officers injected me with so much chemicals at such a fast rate that several mountainous lesions swelled up underneath my left forearm, inflating like balloons. My right thumb swelled up, too, and the tip of my right forefinger started to leak heavily with blood.

20. Several more hours passed as I continued to scream and shout for mercy but no one would help me, not even the three receptionists right outside the door of the room I was in. In fact, I overheard one of them tell the police officer at the door to "Hurry up!" so I would stop yelling and die already.

21. I decided to try to reason with the police officers by stating my Eighth Amendment right of no cruel and unusual punishment. They ignored me and injected me with more lethal chemicals. I then informed them that I was listed in stable condition before being transferred to Room 231 so if I die, then everybody will wonder why — and how — so

8

they'll perform an autopsy, which will reveal all the toxic chemicals inside my body and prove I was tortured and killed by lethal injection of chemicals. They ignored me and continued injecting me. I thought about how I would die here at the very same hospital John F. Kennedy died at then I passed out some time later.

22. The sun came up, which meant the torture session— two torture sessions, actually—took between 12-16 hours in a 2-day period from June 18 to June 19, 2012. I somehow survived but suffered severe permanent injuries from the lethal chemical injections: (1) my senses of smell and taste have been adversely affected by the unknown white vapor from the glass bottle; (2) the mountainous lesions burst into severe third-degree burns all over my left forearm, the chemicals devouring my skin, leaving long linear vein scars that are forever permanent, extremely painful, and grotesquely disfiguring; (3) my right thumb is permanently swollen from the chemical injections and prevents fluid movement; (4) the tip of my right forefinger has been literally blown away and is very sensitive and painful to touch; (5) the vein between my right thumb and forefinger erupted into a long scorching vein scar that is forever permanent, extremely painful, and grotesquely disfiguring,

9

just like my left forearm; (6) and the migraines, nightmares, depression, and extreme physical and internal pain I constantly suffer. (The nurses (Nurse Betsy, Nurse Leah) and doctors (Dr. Gomez, Dr. Mike) at the jails I've been to have confirmed that the long linear vein scars down my left forearm and right hand are due to severe chemical leakage from IVs that originated from inside the veins and erupted out, proving I was indeed injected with lethal chemicals to the point of suffering severe permanent damage.)

23. Due to their unsuccessful attempt at killing me with lethal chemical injections, Police Officer #1 and #2 engaged in a long discussion about what to do next. Police Officer #3 continued guarding the door. I overheard Mike Moore say to Annie, "This guy is awesome! He just won't die!" She replied, "He won't die because he still has something he has to do." Mike Moore, Annie, Sergio, and the African-American nurses' aide eventually exited the room.

24. Police Officer #1 and Police Officer #2 approached my bed. Police Officer #1 said to his partner, "We don't have much time. Shift's about to change. So what's the new plan?" Policer Officer #2 replied, "Okay, we'll say

that while my back was turned, he grabbed my gun, put it in his mouth, and pulled the trigger." I feigned unconsciousness as Police Officer #2 opened my left hand (I am actually right-handed) and placed the handle of his gun on my palm, closing my fingers around it tightly. I immediately pointed the gun at him, trying to squeeze the trigger, but the damage to my forearm prevented the release. The officer quickly pulled the gun away from me and said, "This isn't gonna work," and gusted out his disappointment through puffed cheeks.

25. When the morning shift change finally arrived right behind the white curtain, Police Officer #1 pointed a finger right in my face and warned, "You better confess everything or you know what's gonna happen." I started crying as the police officer left to talk to the new shift.

26. From that morning of June 19 to June 22, 2012, I told every person I thought I could trust—psychiatrists, doctors, other nurses and nurses' aides, even other patients—about how I was tortured by the police officers but nobody helped me, nobody cared. As a result, I tried

to file a formal complaint with the hospital numerous times but my requests were denied over and over again: One nurse told me there was no complaint procedure for Parkland Hospital; another nurse told me she would file the complaint for me but never did; one nurse even told me I got what I deserved. (Her quote: "You deserve it for what you did!")

27. When FBI Agents James Daniel Wofford and Richard D. Burkhead, Jr., arrived to interrogate me on June 22, 2012, I remembered vividly — with luminous and pristine clarity — the warning given by Police Officer #1 that if I did not confess then I would be tortured again. Of course, with no choice, I confessed everything to both FBI agents. Proof that I did not want to talk to the FBI was when I lied to try to protect myself from self-incrimination, as well as to protect my Fifth Amendment right, and when I cried multiple times during the interrogation because I feared I would be tortured again. (A copy of this confession will be attached later under seal due to the confidential and sensitive nature of its contents.) Please see Exhibit 2 for further proof that I do not speak to law enforcement officers ever — unless I've been tortured, of course.

28. FBI Task Force Officer Allen G. Goehring was assigned to watch over me during his guard duty shift from 10:00 p.m. to 6:00 a.m. on June 22 to June 25, 2012. During this time, we engaged in friendly conversations and amicable discussions. I decided to take a chance and tell him about how I was tortured. I told him every detail of the torture and he promised me he would investigate it. He appeased me by keeping a daily log of every person coming and leaving my room, including Mike Moore. Goehring also took down every person's information. Mike Moore got visibly scared. On June 24, 2012, Goehring told me he wanted me to discuss the torture with FBI TFO James Wofford. I did not trust the FBI agent but I reluctantly agreed. Goehring never investigated my torture. (A copy of this interview will be attached later under seal due to the confidential and sensitive nature of its contents.)

29. On June 24, 2012, FBI TFO James Wofford visited me and I talked to him for hours about the torture in meticulous detail. He promised me he would investigate my torture but he never did. In the report of the interview I gave him, Wofford left out most of what I said about the torture and also distorted much of what was in the report.

30. On June 25, 2012, I was appointed Mr. Morris as my attorney,

13

by the U.S. District Court of the Northern District of Texas, Dallas Division. I told him about the torture, but he did not assist in helping me.

31. On June 28, 2012, I was appointed Robert Arrambide as my attorney by the U.S. District Court of the Eastern District of Texas, Sherman Division. I told him about the torture, but he did not assist in helping me.

32. On July 10, 2012, I wrote and mailed a letter to Parkland Memorial Hospital in order to file a formal complaint about the misconduct. I never received a response.

33. On July 12, 2012, I substituted Robert Arrambide with Brook A. Busbee and Sminu Peter as my new attorneys. I told both of them about the torture over and over again from July 19, 2012 to May 28, 2013, asking, pleading, and begging them to file a motion for a medical examination to prove I was tortured into a forced confession. I also told them that the medical records from my discovery packet were doctored and reports falsified in an attempt to cover-up the torture. Brook A. Busbee and Sminu Peter thoroughly agreed to the medical examination and even stated the Court would pay for it. However, they did not pursue it any further. (I

14

wish to pursue it further with a medical examination of my injuries to determine the cause, type, and that they were indeed a result of torture via IV chemical injections.)

34. On January 2, 2013, I was given a mental evaluation by psychologist Robert Johnson at the Federal Correctional Institution in Fort Worth, Texas. I spent hours talking to him about the torture that I experienced in June 2012, crying so much we had to take breaks because it was so traumatic for me. I showed him my torture injuries, and I explained to him that Dr. Gomez of the same FCI, a medical physician, confirmed that the injuries were indeed from IV chemical injections that ruptured, **not** from shrapnel. Robert Johnson acknowledged this and assured me he would speak with Dr. Gomez. Johnson also assured me he would notify the proper authorities about the torture since the FBI failed to investigate the matter. Johnson never did. In his report, Johnson "hypothesized" that I "appeared to have experienced a Brief Psychotic Disorder" during a time when I was allegedly given "medication which has psychoactive properties," even though he is **not** a medical doctor and was not even there at the incident. His hypothesis is merely an **opinion** unsupported by medical fact or evidence, hence my requests for a medical examination. A copy of Johnson's

15

opinion is attached as Exhibit 3.

35. Since my torture in June 2012, I've been sending letters to countless advocacy organizations and civil rights attorneys such as the People's Law Office, ACLU, NAACP, Asian-American Legal Defense and Education Fund, et alia, but because none of them was willing to help me, I filed a complaint with the Professional Standards Unit of the City of Plano Police Department on April 17, 2013. Daniel E. Tyler, Investigator #1736, met with me to discuss my complaint in May 2013. I told him everything about the torture. He started an investigation on May 13, 2013, with a 30-day timetable to complete the investigation. The investigation still has not been completed as of the date of this affidavit. I have written Tyler two letters since June 2013 asking for an update on the investigation and for the names of those involved in my torture for §1983 purposes but I have not received a response. I wrote a letter to the Plano Chief of Police but I did not receive a response as well. A copy of his initial investigation is attached as Exhibit 4.

36. On June 18, 2013, exactly one year after the torture and fifteen days after I signed a plea agreement, Brook A. Busbee

met with me and confirmed that the law enforcement misconduct did occur on June 18-19, 2012 (though she did not go into specifics) and also confirmed my "doctored medical records." (If she told me this before I signed the plea agreement, I <u>never</u> would have signed the plea agreement.)

37. On September 25, 2013, I mailed a second letter to the City of Dallas Police Department (my first letter was sent to the Dallas Chief of Police on April 17, 2013) and requested an investigation into the torture/attempted murder that occurred on June 18 through June 19, 2012, but I never received a response.

38. As aforementioned, after meticulously reviewing my criminal discovery packet, I noticed that my medical records were doctored and reports falsified. All the injuries from the torture/attempted murder at Parkland Hospital appear in the Medical Center of Plano medical files to make it look like they were a result of the accident I was in. The names, signatures, and the false statements of Defendant #11 through #17 also appear throughout the doctored medical records and falsified reports. The criminal discovery packet containing these doctored medical records and falsified reports came directly from the assistant U.S. attorney, Andrew Milton Stover, who has repeatedly denied any misconduct.

17

(Due to the voluminous size of the medical records and reports, all copies will be procured through civil discovery.)

39. On September 26, 2013, I wrote and mailed a letter to the Medical Center of Plano in regards to my medical records being doctored and reports falsified. I never received a response.

All of the information I have submitted in support of Plaintiff's case is true and correct.

ANSON CHI
Plaintiff

Sworn to before me this
27th day of November, 2013.

Mary E. Lewis
NOTARY PUBLIC



MARY E. LEWIS
Notary Public
STATE OF TEXAS
My Comm. Exp. March 25, 2017

EXHIBIT 2

than $500. The defendant discharged from probation on June 30, 1998. His adjustment to supervision is unknown.

| 41. | 06/16/2008 (Age 29) | Carrying a Concealed Weapon in a Vehicle; Santa Ana Superior Court; Newport Beach, CA; Case No.: 08HF1175 | 06/24/2008: 3 years probation; 13 days confinement | 4A1.1(c) | 1 |

This information was verified through computerized records maintained by the Superior Court of Orange County, California, Clerk's Office. On June 24, 2008, the defendant appeared in court with counsel and entered a plea of guilty. A charge of Carry a Loaded Firearm on Person or in Vehicle in Public Place or Street was dismissed. The defendant's probation was revoked on December 11, 2009; however, the details of his violations are unknown. He was discharged from probation on June 23, 2011.

## Criminal History Computation

42.   The criminal convictions above result in a subtotal criminal history score of 1.

43.   The total criminal history score is 1. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 1 establishes a criminal history category of I.

44.   Since the defendant received a two-level enhancement under ███████████████████, subsection (b) states that the defendant's criminal history category from ███████████ (Criminal History and Criminal Livelihood) shall be ███████████.

45.   The *Texas Code of Criminal Procedure*, Article 1.051 requires that a defendant be afforded counsel in any adversarial judicial proceeding that may result in punishment by confinement and in any other criminal proceeding if the court concludes that the interests of justice require representation. This law became effective for all criminal proceedings initiated after January 1, 1966. *Vernon's Ann. Texas* C.C.P. Art.1.02.

## Other Criminal Conduct

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 46.   04/12/2012 (Age 33) | Failure to Identify Fugitive From Justice; Case No.: 002-83966-2012 | Plano Police Department; Plano, TX | 10/03/2012: Dismissed |

This information was verified by a copy of the Order to Dismiss. The case was dismissed because the defendant was in federal custody awaiting disposition on federal charges. Details of this offense are unknown.

EXHIBIT 3 - Page 1

Psychological Evaluation
CHI, Anson
Reg. No. 44588-177

divorce proceedings. During the marriage they did not live together. During their time together, CHI seemed to be a nice person and got along well with his family . . .

Mr. Chi indicated he graduated from Plano Senior High School, Plano, Texas, in 1996. He stated he completed two bachelor's degree in Business/Computer Science and Computer Engineer at University of Texas, Dallas, with a 3.3 GPA. Mr. Chi reported he has worked as a Network Operations Engineer in various capacities for several companies to include Loud Cloud, IBM, Ameriquest, and Taiwan Semiconductor Manufacturing Company. He stated in recent years he has not worked professionally, but has focused on politics and environmental concerns, "I didn't care about the corporate culture any longer and decided to do something for America and pursue politics. I helped out on the Ron Paul campaign and was elected precinct chairman in Travis County." He also reported he is concerned about the environment, "I've traveled around the world to study about the environmental problems, Southeast Asia, Thailand, Cambodia, Malaysia, Philippines, Europe, and 48 states."

Mr. Chi reported no illicit drug use and no problematic alcohol use. He stated that he may occasionally have an alcoholic beverage within a social context.

A review of the defendant's NCIC report dated December 18, 2012, Mr. Chi's criminal history included the following: Carry Concealed Weapon on Person/Vehicle, June 17, 2008; Theft, January 20, 1998; Theft, April 12, 2012; Obstruction of Justice, April 12, 2012; and Traffic Offense, April 12, 2012.

### Medical/Psychiatric History

Upon arrival at FCI Fort Worth, Mr. Chi's medical history was taken and a routine medical examination was given, including laboratory work-up. He denied having any complications at birth and he indicated his developmental milestones were on time. Mr. Chi's blood pressure was 129/88, his pulse was 95, and his temperature was 98.3. He reported no significant medical history other than trauma associated with an explosion in June 2012, i.e., shrapnel/burns on arms, hand, eye, abdomen, and chest.

Mr. Chi denied any prior psychiatric history. He acknowledged, however, that his parents had taken him to a psychiatrist for behavioral problems when he was 14 years of age, "I saw a psychiatrist when I was 14 in Desoto. My parents were very strict and they said I was rebelling because I talked back to them. The psychiatrist, who was also Asian, sent me to a counseling center for a week, but they didn't diagnose me with anything. I was a teenager and I was there for talking back to my parents." During a telephone consultation with Defense Attorney Busbee on December 28, 2012, Ms. Busbee was able to provide additional information related to Mr. Chi's mental status while hospitalized in Parkland Hospital, Dallas, Texas, June 2012. Attorney Busbee noted that Mr. Chi reported that staff at the hospital were putting things in his body and torturing him. When asked about the aforementioned, Mr. Chi indicated that nursing staff had injected something in his IV lines in order to torture him:

. . . After I was in stable condition they put me in a smaller room, room 231. There were three Plano police guarding my room and my ankles were cuffed. One of the cops asked me, "Why'd

# EXHIBIT 3 - Page 2

Psychological Evaluation
CHI, Anson
Reg. No. 44588-177

you do it?" I said, "I don't know what you're talking about." Then two nurses came in, Mike Moore and Annie, but I don't remember her last name. Mike Moore said, "This guy is history, right?" Then Annie raised both her hands and said, "I don't want anything to do with this." I looked at her and told her she was going to hell for what she was about to do. She looked at Mike Moore and said, "He said I'm going to hell." Then Mike Moore said, "The only one going to hell is this terrorist." Then he walked over to a machine and pulled out two IV lines near my ankles and inserted them in the IV lines. I waited about four or five minutes and I was just thinking they were playing with me. I didn't know what it was, I hadn't been in the hospital before . . . The psychologist and doctors who saw me said I was hallucinating and delusional. I know it is far fetched and no one believes me."

The aforementioned episode was discussed with Mr. Chi. This psychologist hypothesized that his symptoms occurred shortly after a significant physical/emotional trauma, as well as, during a time when he would have been provided medication to ease his pain; medication which has psychoactive properties. He noted that those explanations appeared plausible, however, the aforementioned scenario felt very real to him at the time.

## Mental Status and Behavioral Observation

The defendant is a 34-year-old, Asian male who appeared his chronological age. He was pleasant and courteous in all interactions with this psychologist and with medical personnel upon arrival. When told he needed to have a routine test for TB he explained that he had a TB test completed in county jails prior to his arrival at FCI Fort Worth. After numerous attempts to explain the policy/rationale for having the test done at this facility, he continued to refuse, resulting in a force cell move to complete the test. Grooming and hygiene appeared good. He appeared to be of high average intelligence. He presented as alert and oriented throughout the study period. When asked to describe how he typically feels, he stated, "I'm pessimistic because I see the environmental destruction of the world and nothing is being done. I guess I'm sad about that, I used to be happy." Speech was noted as normal in tone, rate and rhythm. No articulation deficits were observed. Memory processes appeared to be intact. Thought processes were logical, coherent and sequential. He reported sleeping eight hours with no disturbance, appetite was described as good. He denied suicidal or homicidal ideation, plan or intent. He denied hallucinations and he did not present as though he was responding to internal stimuli.

## Assessment Results

Personality Functioning

In order to assess his current level of personality and emotional functioning, Mr. Chi was administered the Personality Assessment Inventory (PAI). A review of his overall profile indicated the defendant appeared motivated to portray himself as free of the common shortcomings that most people admit as faults. This is not considered overly atypical given the context of this evaluation. Despite the aforementioned defensiveness a number of areas were listed as possible concerns, i.e., impact of a

4

## EXHIBIT 3 - Page 3

Psychological Evaluation
CHI, Anson
Reg. No. 44588-177

by either of the following:  (1) marked distress that is in excess of what would be expected from exposure to the stressor, or (2) significant impairment in social or occupational (academic) functioning. The stress-related disturbance does not meet the criteria for another specific Axis I disorder and is not merely an exacerbation of a preexisting Axis I or Axis II disorder.  The symptoms do not represent Bereavement.  Once the stressor (or its consequences) has terminated, the symptoms do not persist for more than an additional six months.  Adjustment Disorders are coded based on the subtype, which is selected according to the predominant symptoms.  The specific stressor(s) can be specified on Axis IV. Unspecified: for maladaptive reactions (e.g., physical complaints, social withdrawal, or work or academic inhibition) to stressors that are not classifiable as one of the specific subtypes of Adjustment Disorder.

**Opinion on Competency**

The defendant does not appear to suffer from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense.

**Recommendations**

(1) Mr. Chi appeared to have experienced a Brief Psychotic Disorder, secondary to trauma, sustained in June 2012. There has been no evidence of psychosis since that time, however, his mental status should continue to be monitored on an as needed basis as he continues to negotiate the stressors associated with his legal difficulties

Robert Johnson, Ph.D.
**Licensed Psychologist**
**Primary Evaluator**

Lisa Bellah, Ph.D.
**Licensed Psychologist**
**Reviewer**

Marti Carlson, Ph.D.
**Chief of Psychology Services**
**Reviewer**

7

EXHIBIT 4



*city of plano* **police department**

**Professional Standards Unit**

**COPY**

Gregory W. Rushin
Chief of Police

909 14th Street
P.O. BOX 860358
Plano, TX 75086-0358
972-424-5678

May 13. 2013

Anson Chi
Collin County Detention Facility
4300 Community Blvd (1A-II)
McKinney, TX 75071

Dear Mr. Chi,

This letter verifies that your complaint has been filed with and received by the Plano Police Department Professional Standards Unit. The investigator assigned will make every effort to interview the accused employee(s), witnesses, and review other evidence that could assist in the just resolution of the case.

Our goal is to complete the investigation within 30 working days of assignment. Upon completion, the case will have a supervisory review to determine the appropriate action to be taken. Our goal is to complete the review process within twenty working days of the date the investigation is completed.

Upon completion of the investigation and review, you will be provided written notification of the disposition.

Sincerely,

Dennis McLaughlin, Sergeant
Professional Standards Unit

DM/dt

IA2013-078



**"Professionalism – Integrity – Progress"**



# EXHIBIT 5

Law Firms, Legal Aid Societies, and Advocacy Organizations Contacted By Plaintiff for Legal Assistance (Ordered Chronologically)

## NAME/LOCATION

| | DATE CONTACTED/RESULT |
|---|---|
| 1. Rad Law Firm, Dallas, Texas | 10/12/12, DECLINED ASSISTANCE |
| 2 Hernandez & Browning, Dallas, Texas | 10/12/12, NO RESPONSE |
| 3. David S. Kohm Law Firm, Plano, Texas | 10/12/12, NO RESPONSE |
| 4. Law Firm of McGilberry & Shirer, Dallas, TX | 10/13/12, NO RESPONSE |
| 5. The Burress Snellings Law Firm, Dallas, TX | 10/13/12, NO RESPONSE |
| 6. Kelly Akins, P.C., Dallas, TX | 10/13/12, DECLINED ASSISTANCE |
| 7. Law Firm of Jim Adler, Dallas, TX | 10/30/12, NO RESPONSE |
| 8. Law Firm of Brian Loncar, Dallas, TX | 10/30/12, NO RESPONSE |
| 9. Civil Liberties Defense Center, Eugene, OR | 02/01/13, DECLINED ASSISTANCE |
| 10. American Civil Liberties Union, New York, NY | 03/03/13, DECLINED ASSISTANCE |
| 11. National Lawyers Guild, New York, NY | 03/04/13, DECLINED ASSISTANCE |
| 12. National Criminal Justice Reference Service, MD | 03/23/13, DECLINED ASSISTANCE |
| 13. Prisoner's Rights Research Project, Champaign, IL | 03/24/13, NO RESPONSE |
| 14. Center on Wrongful Convictions, Chicago, IL | 03/24/13, DECLINED ASSISTANCE |
| 15. Prison Activist Resource Center, Berkeley, CA | 03/24/13, WRONG ADDRESS |
| 16. Prisoner's Self-Help Legal Clinic, Newark, NJ | 03/25/13, WRONG ADDRESS |
| 17. Law Office of David M. Wang, Allen, TX | 03/30/13, NO RESPONSE |
| 18. Texas Advocacy Project, Austin, TX | 04/03/13, NO RESPONSE |
| 19. Prison Legal News, Seattle, WA | 04/03/13, DECLINED ASSISTANCE |
| 20. ACLU National Prison Project, Washington, DC | 04/04/13, DECLINED ASSISTANCE |
| 21. NAACP Legal Defense Fund, New York, NY | 04/05/13, NO RESPONSE |
| 22. Prisoner's Rights Research Project, Champaign, IL | 04/25/13, NO RESPONSE |
| 23. Law Office of Harvey Silverglate, Cambridge, MA | 05/02/13, DECLINED ASSISTANCE |
| 24. American Friends Service Committee, Philadelphia, IA | 05/19/13, NO RESPONSE |
| 25. Human Rights Watch, New York, NY | 05/19/13, NO RESPONSE |

26. Prison Activist Resource Center, Oakland, CA      05/20/13, DECLINED ASSISTANCE
27. Prison Law Office, San Quentin, CA               05/20/13, DECLINED ASSISTANCE
28. Southern Center for Human Rights, Atlanta, GA    05/20/13, DECLINED ASSISTANCE
29. Southern Poverty Law Center, Montgomery, AL      05/20/13, DECLINED ASSISTANCE
30. Sylvia Rivera Law Project, New York, NY          05/20/13, WRONG ADDRESS
31. Center for Constitutional Rights, New York, NY   05/20/13, NO RESPONSE
32. Lambda Legal, New York, NY                       05/28/13, NO RESPONSE
33. Legal Services for Prisoners, San Francisco, CA  05/29/13, DECLINED ASSISTANCE
34. Partnership for Safety & Justice, Portland, OR   05/30/13, DECLINED ASSISTANCE
35. TGI Justice Project, Oakland, CA                 05/30/13, NO RESPONSE
36. Transformative Justice Law Project of Illinois   05/30/13, NO RESPONSE
37. People's Law Office, Chicago, IL                 06/04/13, NO RESPONSE
38. People's Law Office, Chicago, IL                 07/01/13, DECLINED ASSISTANCE
39. Special Litigation Section, U.S. D.O.J.          07/01/13, DECLINED ASSISTANCE
40. La Raza Centro Legal, San Francisco, CA          07/01/13, NO RESPONSE
41. Asian American Legal Defense, New York, NY       08/06/13, NO RESPONSE
42. Organization of Chinese Americans, Rockville, MD 08/06/13, NO RESPONSE
43. Asian Law Caucus, Inc., San Francisco, CA        08/08/13, NO RESPONSE
44. World Relief, Seattle, WA                        08/08/13, WRONG ADDRESS
45. Asian Counseling & Referral Service, Seattle, WA 08/08/13, NO RESPONSE
46. Lewisburg Prison Project, Lewisburg, PA          08/11/13, NO RESPONSE
47. Legal Aid Society Prisoners' Rights Project, NY  08/11/13, DECLINED ASSISTANCE
48. Prisoners' Legal Services, Albany, NY            08/11/13, DECLINED ASSISTANCE
49. Prisoners' Self-Help Legal Clinic, Newark, NJ    08/13/13, NO RESPONSE
50. Texas Civil Rights Project, Austin, Texas        08/28/13, NO RESPONSE
51. Legal Aid of North West Texas, McKinney, TX      08/28/13, DECLINED ASSISTANCE
52. Organization of Chinese Americans, Plano, TX     08/30/13, NO RESPONSE
53. Legal Aid Society of Texas, Dallas, TX           08/30/13, NO RESPONSE
54. Columbia Human Rights Law Review, New York, NY   09/08/13, NO RESPONSE
55. Puerto Rican Legal Defense, New York, NY         09/16/13, DECLINED ASSISTANCE
56. Anti-Torture Center, Washington, D.C.            09/23/13, WRONG ADDRESS

57. National Campaign Against Torture, Washington, D.C.   09/23/13, NO RESPONSE
58. Prison Legal Aid Network, Miami, FL   09/30/13, WRONG ADDRESS
59. State Bar of Texas, Austin, Texas   09/30/13, NO RESPONSE
60. Asian-American Legal Defense, New York, NY   10/01/13, NO RESPONSE
61. Center for Victims of Torture, Washington, D.C.   10/04/13, NO RESPONSE
62. Amnesty International, New York, NY   10/04/13, DECLINED ASSISTANCE
63. National Legal Aid and Defender Association   10/10/13, NO RESPONSE
64. Meres Law Firm, Dallas, TX   10/11/13, NO RESPONSE
65. State Bar of Texas, Dallas, TX   10/11/13, NO RESPONSE
66. Dallas Bar Association, Dallas, TX   10/11/13, NO RESPONSE
67. Lawyer Referral Service, Plano, TX   10/11/13, NO RESPONSE
68. Human Rights Watch Prison Project, New York   10/15/13, NO RESPONSE
69. U.S. Commission on Civil Rights, Washington, D.C.   10/16/13, NO RESPONSE
70. Stop Police Brutality, New York, NY   10/19/13, WRONG ADDRESS
71. NAACP, Baltimore, MD   10/21/13, NO RESPONSE

Pursuant to 28 U.S.C. §1746, I, ANSON CHI, the plaintiff
in this case, declare under penalty of perjury that I
have made all 71 contacts from October 12, 2012
to October 21, 2013.

Signed this  29th  day of November, 2013.

ANSON CHI
Plaintiff

3

COLLIN COUNTY DETENTION FACILITY

ANSON CHI, #312275

5A-DD

4300 Community Ave.

McKinney, TX 75071



X-RAY

COLLIN COUNTY
DETENTION FACILITY

7012 1010 0002 8139 1756

PRIORITY MAIL
UNITED STATES POSTAL SERVICE
Visit us at usps.com
Label 107R, January 2008

RECEIVED
DEC 1 2008

To: U.S. District C

Northern Distric

Pro Se Division

1100 Commerce S

Dallas, TX 75